UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
TYRONE BROWN,

                Plaintiff,

    -against-

THE CITY OF NEW YORK, FRANK
SCIORTINO and JOHN McGURRAN,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

        Plaintiff Tyrone Brown, by his attorneys Lumer & Neville, as and for his Complaint, hereby alleges as follows, upon information and belief:

### NATURE OF ACTION

        1.      This is a civil rights action filed pursuant to 42 USC §§ 1983 and 1988, and corresponding claims under New York common law, by which Tyrone Brown seeks to recover compensatory and punitive damages from the defendants with respect to his false arrest in July 2013 and malicious prosecution on multiple felony counts of attempted murder and related crimes, which caused him to be incarcerated for about 16 months, at which time the Kings County District Attorney ("KCDA") moved to dismiss all charges.

        2.      As set forth below, in the early morning hours of June 30, 2013, two gunmen opened fire at an outdoor party in Brooklyn, New York, wounding nine people. During the course of the NYPD's investigation over the following days, the defendants formed the opinion that plaintiff was one of the suspected shooters.

        3.      On July 2, 2013, various members of the police arrested plaintiff as he

was exiting the Holland Tunnel on his way home from work. Plaintiff was then transported to the 67 precinct station house, where the individual defendants were stationed.

4. Plaintiff was presented in lineups before nine separate witnesses. Of these, six were either "no-hits" meaning the witness could not identify anybody in the lineup as a suspect, or "mis-hits," which occur when the witness identifies somebody other than the suspect as the person they claim to have seen.

5. According to the defendants, however, three witnesses successfully identified plaintiff at a lineup. Based entirely on two such identifications, plaintiff was criminally charged by the KCDA in a multi-count indictment and imprisoned at Rikers Island for more than 16 months. No evidence connected plaintiff to the shooting other than these alleged identifications.

6. It was later determined by the KCDA that at least one, if not more, of the witnesses had identified plaintiff as a result of coercive pressure by the defendants, that at least one witness had identified a different person as the shooter, and that this witness had identified plaintiff solely in response to defendants' actions. At least one witness still believed that the person she had first identified was the real shooter, and not the plaintiff.

7. Based on these discoveries, the KCDA immediately took steps to dismiss the prosecution. In mid-October 2014, more than 15 months after his arrest, plaintiff was finally released from Rikers Island. On November 25, 2014, Justice William Miller, apparently acknowledging the injustice that had been done to plaintiff, noted that "[the dismissal of the charges] is a just result" and terminated the prosecution in plaintiff's favor.

## PARTIES, VENUE and JURISDICTION

8. At all times hereinafter mentioned, plaintiff Tyrone Brown was an adult male resident of Kings County, in the State of New York.

9. At all relevant times hereinafter mentioned, defendant City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

10. At all relevant times hereinafter mentioned, defendant Frank Sciortino was a member of the NYPD with the rank of lieutenant, and was assigned to the 67 precinct. Sciortino is sued herein in his official and individual capacities.

11. At all relevant times hereinafter mentioned, defendant John McGurran was a member of the NYPD with the rank of detective, and was assigned to the 67 precinct. McGurran is sued herein in his official and individual capacities.

12. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

13. Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq. in the Eastern District of New York, where the plaintiff and defendant City of New York reside, and where the majority of the actions complained of herein occurred.

14. A Notice of Claim was timely served by the plaintiff upon the defendant City of New York.

15. The City of New York subsequently conducted an examination of the plaintiff pursuant to General Municipal Law §50-H.

16. At least thirty days have passed since plaintiff's service of his Notice of Claim, and adjustment and payment thereof has been neglected or refused by the City of New York.

17. Plaintiff has complied with all of obligations, requirements and conditions precedent to commencing an action against New York City under New York law.

## RELEVANT FACTS

<u>The Shooting</u>

18. On June 29, 2013, an outdoor party was held at 616 East 52 Street in Brooklyn, New York.

19. The party was located in the back and side yards adjacent to the home at this address, and lasted past midnight into June 30, 2013.

20. Plaintiff and several of his friends attended the party.

21. Shortly after midnight on June 30, a fist fight broke out between various men at the party. The plaintiff was not involved in the initiation of the fight, does not know who these people are, or what caused the fight to break out.

22. As the fight rapidly sprawled across the yard, more people were pulled into the melee, including plaintiff, after an unknown male, without cause or warning, struck plaintiff in the face.

23. Security guards – presumably hired by the promoter – who were attempting to intervene in the fighting directed various people, including, plaintiff to leave the premises, which plaintiff did.

24. Plaintiff began walking towards his car, which was parked around the corner and then more than a block away.

25. Plaintiff reached and rounded the corner, and then proceeded to walk another block. As plaintiff neared his car he heard gunfire for the first time that night.

26. Plaintiff was not in possession of a weapon, did not witness the shooting, does not know the identity of the shooter(s), and had no involvement with or information concerning the shooting.

27. Plaintiff continued to his vehicle and drove home.

28. Upon information and belief, at least nine people were shot by one or more gunmen. Each of the victims survived the shooting. Plaintiff did not know any of the victims.

The Arrest and Lineups

29. On July 2, 2013, plaintiff traveled by car to his job in New Jersey, where he was employed as a Utility Worker.

30. He was arrested that day at or about 4:00 p.m. by members of the NYPD as he was exiting the Holland Tunnel in New York County on his drive home.

31. Plaintiff was transported to the 67 precinct station house, located in Kings County, where he was placed in a series of lineups.

32. Upon information and belief, nine people viewed lineups in which plaintiff was displayed.

33. Each of the lineups was conducted by defendants Sciortino and McGurran.

34. At the time of the lineups, Sciortino held the rank of lieutenant and was defendant McGurran's supervising officer.

35. Six witnesses viewed lineups containing plaintiff but did not identify him as one of the shooters.

36. Three witnesses – identified by prosecutors as Witness A, Witness B, and Witness F, supposedly picked plaintiff out of the lineup.

37. In fact, these so-called identifications were facially and fatally deficient as the witnesses could not properly identify plaintiff as the shooter, and did so only with the prodding and coercive assistance of the defendants, who then covered up these actions by withholding from prosecutors and the court the fact that these purported identifications were the by-product of deliberate and coercive conduct by the defendants.

38. In actuality, when she viewed the lineup, Witness A identified somebody other than plaintiff as the shooter. When she did this, one of the defendants sighed and told Witness A to take her time. Witness A then identified plaintiff as the shooter, even though she still believed the first person she had selected was the shooter, not plaintiff.

39. Similarly, upon information and belief, Witness B could not properly identify plaintiff at the lineup and was only able to do under pressure and with assistance

from the defendants.

40. On the night of the shooting, during the early morning hours of June 30, Witness B spoke with a detective and stated that while she was able to see two men fighting, she could not see their faces.

41. On July 1, Witness B was interviewed by McGurran and his colleague, Det. Mark Mirailh, to whom she gave a description of the man she saw that could not reasonably be confused with that of the plaintiff.  Although defendants presented Witness B with a large number of photographs to review, she did not identify plaintiff as the shooter. Rather, she selected another man whom she stated had similar characteristics to the shooter.

42. Upon information and belief, Witness B's eventual identification of plaintiff as the shooter – despite having not seen the shooter's face and despite the fact that Tyrone Brown did not physically resemble the man Witness B had described to detectives following the shooting – can only be understood as the by-product of pressure and coaching by the defendants.

43. Finally, Witness F's supposed identification of the shooter cannot be understood as anything other than a fabrication.

44. On July 1, Witness F was interviewed by Det. Mirailh, at which time she gave a description of one of the men she had seen fighting at the party prior to any gunshots being fired. Witness F expressly stated that she did not see any of the shooters and made no mention of having any other information concerning the identity of the shooters.

45. Despite this prior, unequivocal statement in which Witness F denied

7

any basis for identifying either of the shooters, defendants brought her to the precinct to view a lineup on July 2, after Witnesses A and B had already been coached and otherwise pressed to identify plaintiff. Witness F then inexplicably identified plaintiff.

46. Defendants falsely memorialized the above identification process by creating documents that stated simply that Witnesses A, B, and F, had correctly identified plaintiff as one of the shooters at the party, and by deliberately withholding or omitting the witnesses' inability to identify plaintiff and the defendants' own coercive involvement in the identification process and the steps they took to bring about the false identification of plaintiff.

47. The defendants failed to indicate in any way that any of these witnesses had actually identified somebody other than plaintiff nor did they suggest in any way that any of these witnesses were even remotely uncertain in their identification, that the identifications were unreliable in any way, that the defendants themselves had pressed the witnesses to identify plaintiff or abandon their view that plaintiff was not the shooter and thus substantially caused the witnesses to falsely identify plaintiff as the shooter.

48. As a result of these false identifications, plaintiff was criminally charged. Bail was set at plaintiff's arraignment in the amount of $500,000, which plaintiff was unable to post and plaintiff was thereafter incarcerated by the municipal defendant's Department of Corrections ("DOC") for more than 15 months, until his release on October 18, 2014.

The Prosecution

49. Shortly after his arrest, the KCDA initiated grand jury proceedings with respect to plaintiff.

50. Defendant McGurran, along with several other members of the NYPD, as well as Witnesses A and B themselves, testified to their identification of plaintiff as one of the two shooters. Witness F did not testify nor was there any testimony about Witness F's alleged identification.

51. The only evidence suggesting plaintiff was one of the two shooters was the identification testimony concerning Witnesses A and B. No forensic evidence linked plaintiff to the shooting and nothing was ever recovered from plaintiff's person or vehicle that would suggest he had any involvement in the possession or discharge of any handguns that evening.

52. At no point prior to the grand jury proceedings did any of the three defendants ever communicate to the KCDA in any manner that the identifications made by the three witnesses (A, B, and F) were tainted or compromised in any way. At no point did any of the defendants suggest that any of the witnesses had identified any other person, had been unsure in any way, or were otherwise coerced, pressured, or otherwise improperly interfered in and manipulated the identification process.

53. As a result of both the defendants' conduct leading up to and during the lineups, and their dishonest and materially misleading silence about this misconduct following the false identifications, the KCDA unknowingly presented the eyewitness

testimony to the grand jury as though it were accurate and complete.

54. Another man, Parris Peterson, was the other suspected shooter, and evidence implicating him in that role was also presented.

55. In July 2013, the grand jury issued indictment 05649-2013, which charged plaintiff with eight counts of attempted murder and an assortment of other charges, including weapons and reckless endangerment charges as well as multiple counts of various assault charges.

56. Peterson was indicted simply on three counts of criminal possession of a weapon and one count of reckless endangerment.

57. The case against Peterson was later severed and he was prosecuted separately. Peterson has since entered a plea of guilty to reckless endangerment and has been sentenced to a term of imprisonment of three and one-half to seven years.

58. More than a year after the indictment issued, beginning on July 30, 2014, a hearing further to a suppression motion was held in Kings County Supreme Court, Criminal Term.

59. At no point prior to that hearing – or thereafter – did any of the three defendants, or any other member of the NYPD, ever communicate to the KCDA in any manner that the identifications made by the three identifying witnesses (A, B, and F) were tainted or compromised in any way. At no point did any of the defendants suggest that any of the witnesses had identified any other person, had been unsure in any way, or were otherwise coerced, pressured, or otherwise improperly interfered in and manipulated the

identification process.

60. Accordingly, the KCDA, which had no knowledge or information to suggest that the defendants had improperly caused the identifications to be wrongly made, presented testimony from McGurran and several of his colleagues concerning events surrounding the lineups. No civilian witnesses testified at the hearing.

61. On September 18, 2014, the court issued a ruling denying the plaintiff's suppression motion.

62. Plaintiff remained incarcerated without interruption at Rikers Island and other DOC facilities for more than 15 months following his arrest on July 2, 2013, while the prosecution continued. The incarceration necessarily caused plaintiff to lose his job while incurring substantial legal fees. In addition, while incarcerated, plaintiff was physically assaulted and injured by other inmates and was caused to suffer physical injuries.

63. Meanwhile, following the court's September 2014 denial of plaintiff's suppression motion, the parties prepared for the upcoming criminal trial.

The KCDA Moves to Dismiss

64. In early October 2014, the KCDA began meeting with civilian eyewitnesses in preparation for the upcoming criminal trial of the plaintiff.

65. On October 6, 2014, First Deputy Bureau Chief Fran Weiner wrote to plaintiff's criminal counsel concerning Witness A. More precisely, Ms. Weiner wrote:

> On October 6, 2014, Witness A was present in the Kings County District Attorney's Office in preparation for trial. While discussing the lineup that the witness had viewed, the witness did inform the People that she had initially picked out a

11

different person that she believed to be the shooter. After a detective sighed and told her to take her time, she then picked out defendant out of the lineup. After she made this selection, the two detectives in the room nodded to one another. The witness only changed her selection because of the reaction by the detective and she believes that the original person she picked out was the shooter.

66. Upon information and belief, the KCDA had similar information concerning Witness B, or otherwise had information that suggested that Witness B's identification of plaintiff was similarly flawed.

67. At no time prior to these witness interviews had the defendants, or any other member of the NYPD, communicated to the KCDA that the identifications made by the three identifying witnesses were tainted or compromised in any way or that the defendants had exerted any influence of any sort over the identification process.

68. On or shortly after October 6, 2014, the KCDA began taking steps about plaintiff's release from custody.

69. On October 18, 2014, plaintiff was released from custody.

70. On November 24, 2014, all charges against plaintiff were dismissed and the criminal prosecution terminated in his favor by Supreme Court Justice William Miller, who is reported to have said at the time that "the dismissal is a just result."

71. The defendants knew and understood that they had a continuing duty to notify the KCDA of all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general

credibility, and evidence that a prosecution witness has made inconsistent statements about material facts.

72. The inability of the identifying eyewitnesses to independently identify plaintiff; the selection of individuals other than plaintiff in the lineup; and the coercive, deliberately suggestive conduct of the defendants in order to bring about the purported identification of plaintiff during the lineups, were all events and facts which defendants were duty bound to disclose to the KCDA.

73. The defendants knew and understood that the KCDA was relying on the truthfulness of defendants' claims and statements, as well as the absence of any of the above exculpatory evidence, in order to determine whether to commence a criminal prosecution against the plaintiffs, and that the KCDA would proceed on the assumption that should any such evidence exist, the defendants would promptly notify the KCDA as required.

74. At no time did any of the defendants take any steps to inform the KCDA about any of the deficiencies in the eyewitnesses' supposed identification of plaintiff or the coercive role the defendants deliberately played to bring about the false identification of plaintiff as one of the shooters.

75. Both defendants was aware of their own misconduct and/or that of each other, yet, at no time did any of the defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the illegal, unlawful and unconstitutional conduct engaged in by their fellow officers.

76. That at all times relevant herein, the defendants were acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

## FIRST CAUSE OF ACTION

(§1983 Claims of False Arrest and Imprisonment, Malicious Prosecution, and Denial of a Fair Trial, against defendants Sciortino and McGurran)

77. Plaintiff repeats the allegations contained above as though stated fully herein.

78. The individual defendants willfully and intentionally seized and arrested plaintiff without probable cause, and without a reasonable basis to believe such cause existed, or otherwise failed to intervene while their fellow officers engaged in this unconstitutional conduct.

79. The individual defendants coerced and pressured Witnesses A, B, and F, to identify plaintiff as one of the shooters, or otherwise discouraged them from selecting other individuals as the person they believed they saw firing a gun, and then withheld these facts and their own conduct from the KCDA. To the extent that either of the individual defendants did not affirmatively engage in such conduct, that defendant remained aware of these events and facts and failed to take any corrective steps or otherwise intervene in his co-defendant's misconduct despite ample opportunity to do so during the time plaintiff was prosecuted.

80. By so doing, the individual defendants fabricated and deliberately

14

withheld evidence and misled prosecutors in order to manufacture probable cause for the plaintiff's arrest and prosecution, and to cover up their unlawful conduct in procuring the false identifications, or otherwise failed to intervene while their fellow officers engaged in this unconstitutional conduct.

81. The individual defendants, individually and collectively, subjected the plaintiff to (i) false arrest and imprisonment, (ii) malicious prosecution, and (iii) denial of due process and his right to a fair trial through the fabrication of evidence, and thereby violated and aided and abetted in the violation of plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

82. By reason thereof, the individual defendants have violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, lost earnings and financial injury, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## SECOND CAUSE OF ACTION

(§1983 Monell Claim against defendant City of New York)

83. Plaintiff repeats the allegations contained above as though stated fully herein.

84. The foregoing violations of plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the defendant City of New York, amounting to deliberate indifference to the

constitutional rights of persons, including plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities.

85. Prior to plaintiff's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning, in part, the continuing duty of police investigators to preserve and to make timely disclosure to prosecutors during criminal investigations and prosecutions of all material evidence or information (often referred to as "*Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the prosecuting attorney could comply with his/her constitutional and statutory obligation to disclose such information to the defense.

86. The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the defendant City of New York who had actual or constructive knowledge that

these policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases, and understood that such issues often present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of misconduct or mishandling by NYPD members, as well as incentives that NYPD members have to engage in misconduct, and that such poor decision making or misconduct by NYPD members will frequently cause the deprivation of the constitutional rights of criminal suspects or defendant.

87. The municipal defendant was thus aware and has been aware of these ongoing issues, and there is credible evidence as articulated in a decision issued in the Eastern District of New York in *Collins v. City of New York*, 11 CV 766 (FB) (RML), that such misconduct (i.e., the failure to disclose *Brady* material) was tolerated by the municipal defendant at 923 F. Supp. 2d 462, 479 (E.D.N.Y. 2013).

88. The municipal defendant, acting through the NYPD and its executive officers, has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

89. During all material times herein, the municipal defendant owed a duty to the public generally, and the plaintiff in particular, which the defendant knowingly and

intentionally breached, or to which it was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

90. The aforesaid policies, procedures, regulations, practices and/or customs of the municipal defendant were, collectively and individually, a substantial factor in bringing about the aforesaid constitutional violations by the individual defendants.

91. By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, lost earnings and financial injury, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

### THIRD CAUSE OF ACTION

(State Law Claims of False Imprisonment, Malicious Prosecution, and Denial of a Fair Trial, against all defendants)

92. Plaintiff repeats the allegations contained above as though stated fully herein.

93. Plaintiff was subjected to malicious prosecution, false imprisonment, and the denial of due process and his right to a fair trial by the defendants.

94. At no time did the defendants have any legal basis for imprisoning plaintiff, or commencing criminal process against him, nor was there any reasonable basis to believe said conduct set forth herein was lawful, reasonable, or otherwise appropriate.

95. Defendants' fabrication of evidence, deliberate withholding of evidence, and intentional misleading of the KCDA was unlawful, and there was no reasonable basis by which defendants could have believed said conduct was lawful, reasonable, or otherwise appropriate.

96. The defendants are therefore liable under state law to plaintiff for false imprisonment malicious prosecution, and the denial of due process and his right to a fair trial.

97. The municipal defendant is vicariously liable to the plaintiff for the acts of its employees and agents.

98. By reason thereof, defendants have caused plaintiff to suffer emotional and physical injuries, mental anguish, lost earnings and financial injury, incarceration and the deprivation of liberty.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiff demands judgment against defendants jointly and severally as follows:

    i.    on the first cause of action, actual and punitive damages in an amount to be determined at trial;

    ii.    on the second cause of action, actual damages in an amount to be determined at trial;

    iii.    on the third cause of action, actual and punitive damages in an amount to be determined at trial;

    iv.    statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, disbursements, and costs of the action; and

    v.    such other relief as the Court deems just and proper.

Dated: July 24, 2015
       New York, New York

                  LUMER & NEVILLE
                  Attorneys for Plaintiff
                  225 Broadway, Suite 2700
                  New York, New York 10007
                  (212) 566-5060

By: _/s/ Michael B. Lumer_
Michael B. Lumer (ML-1947)